23-05618MB

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Bryan Stewart, Special Agent of U.S. Homeland Security Investigations Nogales, Arizona, being duly sworn, depose, and state as follows:

## Introduction

1.  I am currently employed as a Special Agent of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I am currently assigned to the office of the Assistant Special Agent in Charge ("ASAC") in Nogales, Arizona. As such, I am an investigative law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I have been a Special Agent with HSI since February of 2022. Prior to joining HSI, I was an Agent of the U.S. Border Patrol ("BPA") from June of 2016, through February of 2022.

2.  As a Special Agent with HSI, I am responsible for investigating and enforcing violations of federal law, to include those enumerated in Title 8, Title 18, Title 19, Title 21, and Title 31. In preparing to become a Special Agent, I attended the Criminal Investigator Training Program and the HSI Special Agent Training at the Federal Law Enforcement Training Center in Glynco, Georgia.

3.  By virtue of my employment as a Special Agent, I have performed various tasks, which include, but are not limited to: (a) functioning as a surveillance agent, observing and recording movements of persons trafficking in drugs and those suspected of

trafficking in drugs; (b) interviewing witnesses, confidential human sources ("CHS") and sources of information ("SOI") about the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (to include the laundering of drug-trafficking proceeds); and (c) functioning as a case agent, entailing the supervision of specific investigations involving the trafficking of drugs, weapons, and illicit proceeds.

4. Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the operational techniques and organizational structure of narcotics smuggling and money laundering networks. I have consulted with other experienced investigators concerning the practices of drug traffickers and the best methods of investigating them. In preparing this Affidavit, I have conferred with other Special Agents and law enforcement officers involved in this investigation. Furthermore, I have personal knowledge of the following facts or have learned them from the individuals mentioned herein.

5. I submit this affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the contents of an electronic communication device capable of accessing the internet (the Target Smartphone, defined below), and the extraction from the Target Smartphone of electronically stored information further described in Attachment B hereto.  Because this affidavit is being submitted for the limited purpose of securing a warrant to search the Target Smartphone, I have set forth only the facts which I believe are necessary to establish probable cause to search the Target Smartphone.

23-05618MB

**Identification Of The Devices To Be Examined**

6.         The electronic communication devices to be examined is described as: one (1) blue Apple iPhone cellular telephone with a clear case, model number unknown, International Mobile Equipment Identity (IMEI) number unknown (hereinafter, "Target Smartphone"). No markings are visible on the exterior of the Target Smartphone except a series of screen cracks on the lower third of the front telephone. The Target Smartphone to be searched pursuant to the attached Application is further described in Attachment A hereto.

**Background On Smartphones**

7.         Based upon my knowledge, training, and experience, as well as information related to your Affiant by law enforcement officers and others experienced in the forensic examination of electronic communication devices, your Affiant knows that certain types of cellular telephones referred to as "smartphones" (such as the Target Smartphone) generally offer more advanced computing ability and internet connectivity than standard cellular telephones.  Provided that internet access has been purchased through an electronic communication service provider for a particular smartphone, a smartphone is capable of running complete operating system software, has full access to the internet and/or electronic mail (including file attachments), is capable of text and instant messaging, can create and edit documents created with computer software, is capable of storing large amounts of data, and can be interfaced with desktop and laptop computers.

8.         As described in Attachment B hereto, this affidavit seeks permission to locate not only data files that might serve as direct evidence of the crimes described in the

warrant, but also for evidence that establishes what individual(s) used the Target Smartphone as well as the purpose of its use. Additionally, this affidavit seeks information about the possible location of other evidence.

9.  As described in Attachment B hereto, this affidavit also seeks permission to search and seize certain electronic records that might be stored within the Target Smartphone. Some of these electronic records might take the form of files, documents, or other data that are user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

10.  Although some of the records requested in this affidavit might be found in the form of user-generated documents (such as electronic format documents and picture and movie files), an electronic communication device (such as the Target Smartphone) can contain other forms of electronic evidence that are not user-generated. In particular, electronic communication devices may contain records of how it has been used and/or the person(s) who utilized the electronic communication device. Based upon my knowledge, training, and experience, as well as information related to me by law enforcement officers, and other persons involved in the forensic examination of electronic communication devices, I know that:

   a. Data on electronic communication devices not currently associated with any file can provide evidence of a file that was once on the electronic communication device, but has since been deleted or edited, or of a deleted portion of a file;

b. Virtual memory paging systems can leave traces of information on an electronic communication device that can be used to determine what tasks and processes were recently in use;

c. Web browsers, e-mail programs, social media platforms, and chat programs store configuration information on the electronic communication devices that can reveal information such as online nicknames and passwords;

d. Operating systems can record additional information, such as the attachment of peripheral electronic devices, and the number of occasions on which the peripheral electronic devices were accessed;

e. Computer file systems can record information about the dates that files were created and the sequence in which they were created.  This information may be evidence of a crime and/or indicate the existence and/or location of evidence in other locations on the electronic communication device;

f. When an electronic communication device has more than one user, files can contain information indicating the dates and times that the files were created as well as the sequence in which the files were created, and whether a particular user accessed other information close in time to the file creation dates, times, and sequences;

g. The types of evidence described above may be direct evidence of a crime, indirect evidence of a crime indicating the location of evidence or a space where evidence was once located, contextual evidence identifying an electronic communication device user, and contextual evidence excluding an electronic

communication device user.  All of these types of evidence may indicate ownership, knowledge, and intent to commit a given offense; and

h.  The foregoing type of evidence is not "data" that can be segregated, that is, this type of information cannot be abstractly reviewed and filtered by a seizing or imaging agent and then transmitted to investigators.  Rather, evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how electronic communication devices operate and how electronic communication devices are used.  Therefore, contextual information necessary to understand the evidence described in Attachment B hereto also falls within the scope of the warrant.

**Characteristics Of Individuals Involved in Drug Trafficking Organizations**

11.     Based upon my knowledge, experience, and training in DTO investigations, as well as the training and experience of other law enforcement officers with whom your Affiant has had discussions, your Affiant knows that there are certain characteristics common amongst individuals involved in DTOs.  Individuals involved in drug-trafficking activity tend to:

a.  Retain records pertaining to financial transactions and the persons for whom the transactions are being conducted;

b.  Collect data pertaining to other co-conspirators involved in drug-trafficking activity, including drug types and quantities provided, as well as monies owed and/or paid for illegal controlled substances;

    c. Possess and maintain records reflecting bank transactions and/or money transfers;

    d. Maintain collections of records that are in a digital or electronic format in a safe, secure and private environment, including electronic communication devices (such as the Target Smartphone).  These records are often maintained for several years and are kept close in close proximity to the drug-trafficker, usually at the individual's residence, to enable the drug-trafficker to review the records, which are highly valued;

    e. Correspond with and/or meet with other drug-trafficking associates to share drug-trafficking information and/or materials;

    f. Retain correspondence from other drug-trafficking co-conspirators relating to drug-trafficking activity; and

    g. Maintain lists of names, addresses, and/or telephone numbers of individuals with whom the drug-traffickers have been in contact and/or conducted drug-trafficking activity.

**Probable Cause**

12. On January 13, 2023, I responded to a call from CBP at the Mariposa Port of Entry (POE) in Nogales, Arizona. CBP had apprehended Felizardo SIQUEIROS after he entered the U.S. driving a 2020 Volkswagen Jetta which was found to contain 108.04 kilograms (kg) of fentanyl and 1.2 kilograms of cocaine.

13. Customs and Border Protection Officers (CBPOs) encountered SIQUEIROS, the sole occupant and driver of his Jetta, in the primary vehicle inspection

lane at the Mariposa POE. The CBPO noticed commercial grade food warmers in the back of the car, and asked SIQUEIROS where he was transporting them, to which SIQUEIROS replied he purchased the warmers at the Soriana store in Mexico, and that he was taking them to his aunt in Tucson, Arizona, for a restaurant she was opening. SIQUEIROS said the restaurant's name was "Guadalupe's Mexican Restaurant" and that it was new. The CBPO asked SIQUEIROS how much he paid for the warmers, to which he replied he paid 1,000, he then turned his face forward looking away from the CBPO. The CBPO asked SIQUEIROS if that was in Mexican Pesos or United States Dollars, SIQUEIROS hesitated for a moment then responded "um, dollars." SIQUEIROS provided the CBPO with a negative declaration to having firearms, narcotics, or currency in excess of $10,000.00. The CBPO stated SIQUEIROS was referred to secondary inspection due to his traveling itinerary, strange responses to questioning and because he was transporting commercial grade equipment which has been a recent trend among narcotics traffickers.

14. A CBPO stated he witnessed SIQUEIROS using his cellular telephone when he approached him in the secondary inspection area and instructed him to put away his telephone. The CBPO asked SIQUEIROS what the large containers in his backseat were, to which SIQUEIORS said they were for his aunt's business that she is starting in Tucson. SIQUEIROS said he went to pick them up and was taking them back to his house in Amado, Arizona, to hang onto them for her. SIQUEIROS said he was just doing a favor for her and purchased them at a store in Mexico. SIQUEIROS provided a negative declaration to the CBPO to having firearms, narcotics, or currency in excess of $10,000.00. The CBPO escorted SIQUEIROS to the secondary general waiting area. The CBPO sent

SIQUEIROS' Jetta through the Z-Portal x-ray machine to continue his secondary inspection.

15. The CBPO operating the Z-Portal x-ray Machine noticed anomalies inside the commercial food warmers located in the back seat and trunk of the vehicle.

16. A CBPO returned to SIQUEIROS for additional questioning. The CBPO asked SIQUEIROS if he had the receipt for the commercial warmers, to which SIQUEIROS stated he had lost it in the car. The CBPO instructed SIQUEIROS that when importing commercial items, he is required to have a receipt. The CBPO asked SIQUEIROS if he was taking the commercial food warmers to Tucson to his aunt, to which SIQUEIROS replied no, stating he was going straight home. The CBPO asked SIQUEIROS how his aunt was going to get the commercial food warmers, to which SIQUEIROS stated he was going to hold it for her for one (1) month at his home, in Amado.

17. A CBPO removed one of the commercial food warmers from the Jetta, placed it on the ground and requested a canine unit for a search of the warmer and the vehicle. A CBP Canine Enforcement Officer and his assigned canine conducted a search of SIQUEIROS' Jetta and the commercial food warmers. The canine provided a positive alert to the commercial food warmers. The food warmers were taken to the Agricultural X-Ray Machine for further inspection.

18. A CBPO took the commercial food warmers to be inspected with a CBP Agricultural Specialist. The CBPOs noticed anomalies within the commercial food warmers. SIQUEIROS was placed in handcuffs and escorted to a secure location. The commercial food warmers, two (2) curved, one (1) rectangular, and one (1) soup warmer, were disassembled by CBPOs. A total of 193 packages were removed from the containers.

Two (2) packages containing multi-colored pills, weighing 1.2 kilograms, were tested by a CBPO utilizing a Rapid Response Test Kit and tested positive for the characteristics of fentanyl. 186 packages containing blue pills marked with "30" on their faces, weighing 104.68 kilograms, were tested by a CBPO utilizing a Rapid Response Test Kit and tested positive for the characteristics of Fentanyl. Four (4) packages containing green pills, weighing 2.16 kilograms, were tested by a CBPO utilizing a Rapid Response Test Kit and tested positive for the characteristics of fentanyl. One (1) package containing a white powdery substance, weighing 1.2 kilograms, was tested with a rapid response test kit and produced a negative test result to the characteristics of fentanyl. A CBPO used a calibrated Gemini Narcotics Testing Device on the white powder which yielded a positive result for the characteristics of cocaine.  The narcotics, and vehicle were seized by Customs and Border Protection.

19.     In a post-*Miranda* interview of SIQUEIROS, he stated that he was asked to do a favor for his "aunt," Guadalupe SIQUEIROS, to drive to Mexico and pick up several commercial food warmers. SIQUEIROS admitted that this individual was not related to him and that he has known her for approximately four (4) or five (5) years. SIQUEIROS claimed Guadalupe was instructed by people she knew to ask SIQUEIROS to pick up the commercial food warmers. SIQUEIROS stated he was instructed by Guadalupe to meet at a Shell gas station on the corner of 12th Avenue and Valencia Road in Tucson, to receive money to pick up the equipment. SIQUEIROS was given $3,000.00 and instructions to ask for a manager, "Luis," at the Soriana Super Store in Nogales, Sonora, Mexico. SIQUEIROS was asked what his instructions were to do with the $3,000.00 he was given,

to which SIQUEIROS stated, "Give this money to them, they know what they're doing" and "I fucked up."

20.	SIQUEIROS stated when he arrived at the Soriana on the night of January 12, 2023, he asked for "Luis" and said he was there to pick up the food warmers. SIQUEIROS paid "Luis" $500.00 from the money he was given, and then paid an additional $2,500.00 for the equipment. SIQUEIROS claimed a female and two men wheeled the equipment out from a back room in the Soriana and explained that the equipment was not boxed up in any retail packaging. SIQUEIROS said he did not see anyone scan the equipment at the check-out registers and claimed to have lost the receipt for the equipment. SIQUEIROS stated that he watched employees of Soriana load the equipment into the trunk and backseat of his car.

21.	SIQUEIROS said he was told to deliver the equipment to the Shell Gas Station on 12th avenue and Valencia to Guadalupe. SIQUEIROS claimed he was going to be paid $1,000.00 to do this. SIQUEIROS was asked why he would be paid $1,000.00 to do someone a favor, to which SIQUEIROS explained that he has heard from people in the streets and on the news when people are caught, that $1,000.00 was the usual payment for picking stuff up. SIQUEIROS claimed things have been tough for him financially since his divorce and that he needed the money.

22.	When asked about how he would be in contact with "Lupita" or anyone involved with the narcotics, SIQUEIROS said that the people knew what they were doing, and wouldn't tell him their names or telephone numbers, and that they are smart. When asked about who would be in contact with him about this shipment and who would care if

it went missing, SIQUEIROS replied that he wasn't comfortable answering anymore questions.

23.     On the lock screen of the Target Smartphone, 13 notifications were observed. Five (5) were WhatsApp messages from the following contacts: "German Suarez Valle Golfas," "Tio Martin," "Paulina Vasquez," "Phone," and "Fiesta Inn Nogales." All of the WhatsApp messages were sent to the Target Smartphone while SIQUEIROS was in custody. Eleven messages from "German Suarez Valle Golfas" were sent to the Target Smartphone, ceasing approximately 28 minutes prior to SIQUEIROS being interviewed by your Affiant. Two (2) text messages from "+1-520-900-1251" were sent to the Target Smartphone approximately two (2) hours after SIQUEIROS was arrested. A text message from "96895" was sent to the Target Smartphone approximately two (2) hours after SIQUEIROS was arrested. One (1) notification from Instagram was sent to the Target Smartphone approximately two (2) hours after SIQUEIROS was arrested, with one (1) additional Instagram notification being sent to the Target Smartphone three (3) hours prior. Two (2) notifications from TikTok were sent to the Target Smartphone approximately two (2) hours after SIQUEIROS was arrested. Two (2) notifications from SnapChat were sent to the Target Smartphone approximately three (3) hours after SIQUEIROS was arrested.

24.     Based upon the foregoing, I believe that probable cause exists to search the Target Smartphone for the items set forth in Attachment B hereto. I believe that the Target Smartphone contain evidence relating to the commission of a criminal offense, that is, the importation of controlled substances, in violation of Title 21, United States Code, Section 952(a), and possession with intent to distribute a controlled substance, Title 21, United

States Code, Section 841, as well as constitutes property designed for use, intended for use, or used in committing the aforementioned crime.

I swear, under penalty of perjury, that the foregoing is true and correct.

BRYAN J STEWART
Digitally signed by BRYAN J STEWART
Date: 2023.02.02 10:31:33 -07'00'

Bryan Stewart

Special Agent, ICE/HSI

Sworn and subscribed to before me this 2nd day of February 2023.

LYNNETTE C. KIMMINS,
United States Magistrate Judge